**A.P.S., INC., Plaintiff,**

v.

**STANDARD MOTOR PRODUCTS, INC., Defendant.**

**No. CIV.A. 01–357–SLR.**

United States District Court, D. Delaware.

July 8, 2003.

William H. Sudell, Jr., Donna L. Culver, James G. McMillan, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Counsel for Plaintiff.

Mark Minuti, Jeremy W. Ryan, Saul Ewing, LLP, Wilmington, Delaware, Of Counsel: Paul F. Doyle, Kelley, Drye & Warren, LLP, New York City, Counsel for Defendant.

## OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

On February 2, 1998, APS Holding Corporation and nine of its direct and indirect subsidiaries, including plaintiff A.P.S., Inc., filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* The present case was subsequently filed as an adversary proceeding in the United States Bankruptcy Court for the District of Delaware. On May 29, 2001, this court issued an order withdrawing the adversary proceeding to the United States District Court for the District of Delaware. (D.I. 1)

On May 10, 2002, defendant Standard Motor Products, Inc., filed a motion for summary judgment which the court subsequently granted in part and denied in part. (D.I. 31, 88) Between September 9 and September 12, 2002, the court held a bench

trial on the remaining issues. The following are the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## II. FINDINGS OF FACT

### A. The Parties

1. Plaintiff A.P.S., Inc. ("APS") was a Delaware corporation with its principal place of business in Houston, Texas. (D.I. 83 at ¶ 1) Prior to February 2, 1998, when it filed a voluntary petition for reorganization relief under Chapter 11, and until approximately February 1999, when it ceased doing business and began the process of winding up its operations, APS was a warehouse distributor of automotive replacement products to the automotive aftermarket. (*Id.* at ¶ 2)

2. Defendant Standard Motor Products, Inc. ("SMP") is a New York corporation having its principal place of business in Long Island City, New York. (*Id.* at ¶ 3) SMP is a manufacturer of automotive replacement parts which it distributes for resale to warehouse distributors and large auto parts retail chains under its own brand name and under private labels which it manufactures for key customers. (*Id.* at ¶ 4) SMP manufactures or supplies over 60,000 automotive parts to the automotive aftermarket industry. (D.I. 112 at 491)

### B. The Parties' Pre–Petition Business Relationship

3. For approximately ten years prior to its bankruptcy filing, APS purchased a variety of tune-up, temperature control and service line automotive products from SMP which it resold (both wholesale and retail) under the private label "Big A" and "AutoPro" brands through a network of warehouse distribution centers, Installer Service Warehouses ("ISWs") and company-owned and associated jobbers (retail stores) located throughout the United States. (D.I. 83 at ¶ 9)

4. At the time of its bankruptcy filing, APS had 27 warehouse distribution centers and two redistribution centers through which it wholesaled replacement parts to approximately 273 "Big A" company owned jobbers and 1650 associated jobbers. (*Id.* at ¶ 10) APS also wholesaled parts to professional installers through its network of 214 ISW locations. (*Id.* at 11)

5. During the year immediately preceding its bankruptcy filing, APS purchased in excess of $70 million in parts from SMP and was SMP's second largest customer. (*Id.* at ¶ 12)

6. The terms governing the parties' pre-petition business relationship were set forth in three principal written contracts, including: (1) an October 6, 1989 "Sales and Distribution Agreement Between Standard Motor Products Company, Inc. and A.P.S., Inc. for Temperature Control Products" (the "Temperature Control Products Agreement"), as amended on October 26, 1989 (PX 2, 3); (2) an October 6, 1989 "Sales and Distribution Agreement Between Standard Motor Products Company, Inc. and A.P.S., Inc. for Tune–Up Products" (the "Tune–Up Products Agreement"), as amended on October 26, 1989 (PX 1, 3); and (3) an April 22, 1993 "Sales and Distribution Agreement Between Standard Motor Products Company, Inc. and A.P.S., Inc. for Big–A Service Line and Speciality Tool Line Products" (the "Big–A Agreement"), as amended in June 1997 (PX 5, 83). Collectively, these three agreements constituted the "pre-petition agreements" which were all extended through December 31, 2003. (PX 7)

7. The pre-petition agreements were the contracts that were the "basis upon which basically the two companies did business." (D.I. 110 at 40) The pre-peti-

tion agreements provided the terms for purchase prices; terms of payment; cash discounts for early payment of invoices; return of overstocked product; and receipt by APS of purchase incentives pursuant to programs that SMP would make available from time to time. (PX 1, 2, 5, 7)

8. The pre-petition agreements stated that they could not be amended or modified except in writing, and contained a general merger clause providing that the agreements contained the entire agreement between the parties and superceded all prior agreements. (PX 1 at 26; PX 2 at 25; PX 5 at 16)

9. During the parties' pre-petition business relationship, the pre-petition agreements were amended from time to time in writing by letter agreements modifying the terms. (PX 3, 6, 7, 8; DX 10)

10. In addition to the formal agreements, the parties handled "daily considerations" as market conditions changed and the parties' needs changed through oral agreements typically over the telephone. (D.I. 110 at 38–43) These oral agreements were sometimes memorialized by subsequent letters or sometimes not at all. (PX 8; D.I. 110 at 39, 41–3) These oral agreements were used to get authorization to exceed normal return allowances, negotiate additional discounts or rebates, or modify payment dates, for example. (D.I. 110 at 42–5)

11. **Pre–Petition Payment Terms.** Pursuant to the pre-petition agreements, APS purchased various automotive products from SMP at a discount off SMP's published suggested jobber price sheets which, depending upon the particular product line, ranged from 25% to 32.5%. (PX 1, 2, 5; D.I. 110 at 43–4)

12. During the pre-petition period, APS received a monthly statement from SMP on or about the 25th of each month which listed all open invoices, as well as amounts credited to APS's account from the 26th of the prior month through the date of the statement. (D.I. 110 at 44) For orders placed in excess of a specified dollar amount, and depending on the specific product line, APS's net payment was due on the 10th or the 25th day of the third calendar month following the statement closing date. (PX 7; D.I. 110 at 44–5)

13. For invoices paid five days or more before the net payment was due, the pre-petition agreements provided that APS would receive a 2% cash discount off of the invoice price. (PX 7; D.I. 110 at 45) This discount was taken by APS as a deduction off the invoice amount at the time payment was made to SMP. (D.I. 110 at 45)

14. The purpose of this 2% cash discount was to give SMP's customers an incentive to pay early so that cash flow would be available to SMP in a more timely manner. (D.I. 111 at 372) None of SMP's customers who operated on cash in advance payment terms received a cash discount since it was not possible to pay earlier under those terms. (*Id.* at 372–73)

15. **Pre–Petition Purchase Incentives (Rebates).** Under the terms of the Temperature Control Products Agreement and the Tune–Up Products Agreement, SMP agreed to include APS in all purchase incentive programs (i.e. rebates or volume discounts) offered by SMP from time to time, including SMP's Performance Incentive Program (the "PIP Program"). (PX 1, 2) Pursuant to the PIP Program, APS would receive a quarterly rebate based on its qualifying purchases of various product lines during the immediately preceding quarter. (D.I. 110 at 50–1)

16. In addition to the PIP rebate, APS also received quarterly rebates based on the volume of its purchases of fuel pumps and value line products from SMP. (D.I. 110 at 50) All of these rebates were typi-

cally paid to APS by company check within four to six weeks following the close of the quarter during which the rebates were earned based on SMP's calculation of APS's qualifying net purchases. (D.I. 110 at 50–1)

17. The pre-petition agreements stated that APS would be eligible to receive purchase incentives, provided that it met the necessary prerequisites of the programs, conditioned on APS's timely payment of its accounts. (PX 1 at 13, 2 at 11) SMP's written requirements for participation in its incentive programs likewise required the customer's accounts to be current and that it have an ongoing purchase relationship with SMP at the time payment was to be made. (PX 1 at Ex. B, PX 2 at Ex. B, DX 112, 177; D.I. 111 at 346, 374–76) SMP had never given volume rebates or purchase incentives to customers in reorganization or liquidation proceedings. (D.I. 111 at 376)

18. **Pre–Petition Warranty Returns.** The pre-petition agreements permitted APS to return to SMP for inspection any product claimed to be defective by APS's customers in accordance with SMP's warranty policies and procedures. (PX 1 at 18, PX 2 at 16, PX 5 at 7–8) Upon receiving these products from its ISWs or company owned jobbers, APS's distribution centers created a Return Goods Notice ("RGN"), which listed the part number, return date, alleged reason for return (i.e., defective), and amount for which APS was seeking return credit from SMP and, thereafter, ship the products to SMP. (D.I. 110 at 48–9, D.I. 211, 268)

19. Upon receipt of the returned product and accompanying RGN, SMP would issue the appropriate credit to APS. (D.I. 110 at 48–9, D.I. 111 at 373) This procedure was relatively standard in the automotive aftermarket industry. (D.I. 110 at 48–9)

20. **Pre–Petition Core Returns.** During the pre-petition period, APS was also permitted to return "cores," which are portions of parts previously purchased that may be returned and remanufactured, for credit. The amount of the credit was determined at the time of purchase and was limited to the number of products containing cores that APS actually purchased during the pre-petition period. (D.I. 111 at 376–77)

## C. The Parties' Post–Petition Business Relationship

21. **The Bankruptcy.** On February 2, 1998, APS Holding Corporation and nine of its direct and indirect subsidiaries, including APS, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101. (D.I. 83). At the time of the petition, APS owed SMP over $15 million in unsecured debt for product it received but for which it did not pay. (DX 24, 62; D.I. 110 at 134, D.I. 111 at 382–83, D.I. 112 at 462)

22. Within hours after its bankruptcy petition was filed, APS's Vice President of Purchasing, Charles Popik, placed a call to SMP's Senior Vice President and Chief Financial Officer, Michael Bailey, in order to advise him of the bankruptcy filing, and of the importance to APS in securing an uninterrupted flow of product from SMP so that APS could continue filling its customers' orders. (D.I. 110 at 52–3)

23. Upon learning of APS's bankruptcy petition, SMP froze APS's existing open accounts and stopped its shipments that were in transit. (D.I. 111 at 381–82) Within a day after the filing, the parties began negotiations regarding the terms upon which the parties would continue to do business. (D.I. 110 at 51–3, D.I. 111 at 313–14, 593–95) Ultimately, APS did not

assume the pre-petition agreements. (D.I. 80)

24. **Post–Petition Payment Terms.** As a result of discussions between the parties, on February 4, 1998, APS and SMP signed a letter agreement (the "February 4 Agreement") containing the payment terms and procedure under which SMP would continue to sell product to APS on a post-petition basis. (PX 11; D.I. 110 at 53–4, D.I. 111 at 316, 385) Because SMP was owed a substantial pre-petition amount, it refused to continue to extend credit terms to APS on a post-petition basis. (D.I. 110 at 53–4)

25. The February 4 Agreement provided that all post-petition product shipments from SMP to APS would be on a pre-paid or cash in advance basis. (PX 11) Additionally, APS was required to, and did, immediately overnight payments to SMP of $50,000 and $550,000 to establish a pool of funds from which to pre-pay daily emergency orders and regular warehouse stocking orders, respectively. (*Id.;* D.I. 110 at 56–7) Furthermore, in order to ensure that SMP had sufficient funds on hand to cover the value of all of its shipments to APS during the post-petition period, the February 4 Agreement required APS to overnight checks to SMP on a daily basis in order to pre-pay the orders that it placed with SMP the previous day. (PX 11; D.I. 110 at 57)

26. The February 4 Agreement made no provision for cash discounts, rebates or warranty returns but, rather, stated that SMP would be "willing to consider other terms of sale once the creditors committee had been formed and complete updated financial and operational information has been made available to Standard Motor Products." (PX 11; D.I. 111 at 386) After the February 4 Agreement was executed, the parties continued discussions upon which SMP would sell products to APS.

27. During the post-petition period, APS continued to press for credit terms. On or about June 3, 1998, the parties entered into a written letter contract (the "546(g) Agreement"), signed by both parties and approved by the bankruptcy court, under which SMP agreed to grant APS a $700,000 line of credit against $700,000 in cores returned by APS during the post-petition period, and for which SMP would issue credit to the pre-petition account. (DX 38) Because it was not possible to determine how many of the cores returned had actually been purchased during the pre-petition period, the $700,000 was a negotiated value based on the parties' estimated value of APS's pre-petition purchases containing cores. Therefore, APS was able to make purchases on credit up to the value of the cores returned and applied to the pre-petition debt. (DX 38; D.I. 111 at 389–90)

28. The February 4 Agreement and the 546(g) Agreement were the only two agreements signed by both parties during the post-petition period. (D.I. 110 at 89) During the post-petition period, APS purchased over $50 million in product from SMP. (PX 40, 84; D.I. 110 at 35, 195) With the exception of $700,000 of product APS purchased pursuant to the 546(g) Agreement, APS pre-paid for all of its product purchases from SMP during the post-petition period. (D.I. 110 at 58)

29. **Post–Petition Cash Discounts.** Because the February 4 Agreement did not provide for the reinstatement of cash discounts to APS, the parties continued to negotiate the terms of a post-petition cash discount. (D.I. 110 at 63–4, D.I. 111 at 388) On April 6, 1998, Michael Bailey, SMP's President and CFO, stated by letter that SMP would provide APS a 1% cash discount on all purchases made by APS after March 31, 1998. (PX 21; D.I. 111 at 317) APS, however, continued to

request that SMP reinstate the full 2% discount it was getting during the pre-petition period. (D.I. 110 at 65) As a result of these requests, SMP agreed to increase the cash discount to 1.5% effective May 1, 1998. (PX 21, DX 42; D.I. 110 at 65, D.I. 111 at 388)

30. SMP agreed to provide cash discounts to APS on a post-petition basis in an effort to assist the company during its reorganization. (D.I. 111 at 318, 389) Since APS was already paying for its products in advance, the cash discount was no longer serving as an incentive to pay early. (*Id.*)

31. **Post–Petition Purchase Incentives (Rebates).** After the February 4 Agreement, the parties continued to negotiate the issue of whether purchase incentives would be paid. (D.I. 110 at 63, D.I. 111 at 330–31, 395) On April 15, 1998, Chester Edwards, SMP's Corporate Credit Manager and one of its representatives on APS's Creditors' Committee, sent a letter to Mr. Popik at APS outlining SMP's position with respect to, *inter alia*, purchase incentives. (PX 22) The letter stated that SMP would

> honor all PIP incentives earned under the terms of our PIP program. All incentives related to sales before the bankruptcy filing will be credited to the pre-petition accounts. PIP incentives related to post petition sales will be issued as credits to the post petition account and will be available to offset new purchases. PIP incentives will be calculated quarterly in arrears.

(*Id.*)

32. Mr. Popik and Mr. Edwards subsequently discussed the PIP provisions of the April 15 letter and Mr. Popik informed Mr. Edwards that the terms were acceptable to APS. (D.I. 110 at 70–1)

33. APS continued to purchase goods from SMP after receipt of the April 15 letter. However, several weeks later, when APS did not receive a rebate payment from SMP for its first quarter 1998 post-petition purchases, Mr. Popik contacted Michael Bailey at SMP to inquire about the status. (D.I. 110 at 71) As a result of a discussion in which Mr. Bailey requested that APS send a letter to Mr. Edwards outlining how the rebates earned by APS were to be applied between APS's pre and post-petition accounts, Mr. Popik sent a letter to Mr. Edwards on June 4, 1998 memorializing APS's agreement to the conditions with respect to the PIP provisions of the April 15 letter. (PX 25; D.I. 110 at 72)

34. APS received no response to its June 4 letter but, instead, received a letter dated July 2, 1998 from SMP's Treasurer, David Kerner, stating that the requirements for SMP's incentive programs was that a customer be current on its accounts and APS was not. (PX 26, D.I. 111 at 324, 344) However, Mr. Kerner indicated that SMP would be willing to continue to pay APS incentives provided that APS agree to certain specified conditions including: that APS agree that all incentives related to pre-petition sales be credited to the pre-petition account; that APS obtain the approval of the bankruptcy court for the proposed credits to the pre-petition account; and that APS agree to the amount of the rebates set forth in the letter. (*Id.*) The letter concluded with a signature line for an APS representative if APS was in agreement with the terms. (PX 26)

35. APS did not agree with the terms of the letter and did not accept the agreement set forth in SMP's July 2, 1998 letter. (D.I. 110 at 73–5)

36. On July 24, 1998, Mr. Kerner sent another letter to APS revoking the terms of the July 2 letter and setting forth new

terms under which SMP would be willing to pay APS incentives. (PX 28) Under the new terms, SMP would be asserting its alleged right to recoupment and would be applying all incentives to its pre-petition accounts until the pre-petition balance was paid. (*Id.*)

37. Upon receiving SMP's July 24 letter, Mr. Popik contacted Mr. Kerner to protest SMP's position and asked SMP to reconsider, emphasizing the importance of the continued incentive payments post-petition to APS's turnaround. (D.I. 110 at 77–8, D.I. 111 at 325–26)

38. In response to this conversation, Mr. Kerner sent another letter to APS dated August 5, 1998 memorializing a verbal proposal from the conversation stating that SMP would pay rebates earned by APS during the last quarter of 1997 and the first quarter of 1998 in accordance with the methodology set forth in the April 15 letter, provided that APS would agree to forego its right to any future rebates. (PX 30) APS subsequently refused to accept the terms of SMP's August 5 letter. (D.I. 110 at 79)

39. Throughout the post-petition period, SMP continued to calculate the PIP rebates APS would be eligible for based on its post-petition product purchases. (D.I. 111 at 348, 405) Based on the July 2 letter and quarterly reports generated by SMP through the fourth quarter of 1998, the amounts were:

| | |
|---|---|
| February—March 1998 | $ 825,133.49 |
| April—June 1998 | $1,208,321.67 |
| July—September 1998 | $1,054,645.42 |
| October—December 1998 | $ 319,981.57 |

(PX 26, 36, 80, 81) Additionally, Mr. Popik estimated that APS was eligible for an additional $100,000 in rebates based on products purchased in January and February of 1999. (PX 40; D.I. 110 at 86) SMP never paid APS any post-petition rebates.

40. **Post–Petition Warranty Returns.** During the post-petition period, APS attempted to return approximately $4.2 million of warranty product to SMP. (PX 42; D.I. 110 at 123–24)

41. As of the date of the bankruptcy petition, APS had received approximately $15 million in parts from SMP for which it had not paid. Accordingly, SMP took the position that it would no longer accept warranty returns from APS post-petition unless the parties could agree to a return program, approved by the bankruptcy court, because it was not possible to determine how much of the product sought to be returned had been purchased pre-petition and were not paid for. (PX 22, DX 171, 172, 177; D.I. 110 at 129–30, D.I. 111 at 394) SMP did not believe that APS should be permitted to return product it never paid for and then obtain a credit because SMP "would have lost twice on that product." (D.I. 111 at 327–28)

42. Additionally, SMP was concerned about APS's rapid consolidation and the prospect that defective and non-defective inventory might get commingled, resulting in high amounts of non-defective inventory being returned as warranty returns. (D.I. 111 at 327, 348–49) In the past, SMP's warranty return policy had been abused by other customers who wanted to reduce their inventory by returning large numbers of good products as purportedly defective. (D.I. 111 at 349–51)

43. Furthermore, there was evidence that APS had mismanaged its inventory such that it was "completely out of hand" which contributed to its bankruptcy. (D.I. 110 at 149–51)

44. Following APS's bankruptcy petition, the parties attempted to negotiate the issue of warranty returns. (DX 177; D.I. 110 at 68, D.I. 111 at 328, 393, 397) In its April 15 letter, SMP stated that it would start accepting warranty returns after the

parties reached an agreement on a formula to determine what amount would be applied pre-petition and what amount should be applied to post-petition, as had been done with the issue of core returns. (PX 22; D.I. 111 at 392–93) Again, SMP wanted bankruptcy court approval for the agreement prior to accepting any warranty returns for credit to the pre-petition accounts in order to protect itself. (D.I. 111 at 392–93)

45. APS did not accept SMP's terms because APS did not believe its bank group would agree to the terms and, ultimately, no agreement between the parties was ever reached. (D.I. 110 at 67, 100–01, D.I. 111 at 328, 393, 397)

46. **The Post–Petition Account Reconciliation.** APS's last purchases from SMP occurred in February 1999 and APS discontinued substantially all of its operation by April 1999. (D.I. 83) As APS wound down its operations during the first half of 1999, it had to reconcile the open accounts with its suppliers. (D.I. 110 at 84)

47. In connection with this process, a reconciliation of the approximately 20,000 post-petition transactions between APS and SMP was prepared by APS under the direction of APS's Director of Distribution Center Accounting, Stephen Smith. (PX 40; D.I. 110 at 189, D.I. 111 at 248) Initially, APS's reconciliation indicated that APS had overpaid SMP by $1,826,673.80. (PX 40)

48. The APS reconciliation was forwarded to SMP on or about May 11, 1999. APS sent SMP a summary of its reconciliation but did not send SMP copies of any supporting schedules, or other raw data APS used to generate its reconciliation.

(PX 40; D.I. 110 at 175, D.I. 111 at 202, 258) SMP subsequently asked APS for the source documents or schedules supporting its reconciliation numbers but APS did not respond or provide the information requested. (D.I. 110 at 173–75, D.I. 111 at 245, 248, D.I. 112 at 559–61, 567, 578–79)

49. Upon review of the reconciliation by Irwin Blanch, SMP's Assistant Corporate Credit Manager, some discrepancies in the calculations were found. (D.I. 110 at 203–04, D.I. 112 at 562–63) First, a refund of an overpayment by APS in the amount of $1 million was recorded in the APS reconciliation as only $500,000 and, second, a check from APS to SMP in the amount of $438,806.59 that was included in the reconciliation had never been cashed and was, in fact, returned to APS. (*Id.*)

50. APS agreed with these discrepancies and others, and ultimately, reduced the amount it contended it overpaid SMP to $714,010.08.[1] (D.I. 110 at 202–05) Upon receiving APS's reconciliation, Mr. Blanch was instructed by Mr. Edwards to perform SMP's own reconciliation. (D.I. 112 at 557–58) Upon performing its own reconciliation, SMP concluded that APS owed SMP $267,372.67. (DX 84)

51. SMP then sent its reconciliation numbers to APS by a letter dated June 28, 1999; however, before any response, APS sued SMP for approximately $30 million in a complaint dated June 30, 1999. (DX 84, 85) Thereafter, Mr. Blanch tried, without success, to contact Mr. Smith to again request APS's supporting data so the parties could resolve their differences in the open account. Mr. Smith, however, was not available because shortly after APS sued SMP, APS closed its accounting center. (D.I. 112 at 574)

---

1. The numbers the parties proffered remained a moving target during the litigation and throughout the parties' post-trial briefs, making ascertaining what the parties, particularly plaintiff, was actually claiming an arduous task for the court.

52. The disparity between the parties' reconciliations arises from essentially three categories:

(a) A difference of $356,713.07 in the total amount APS was billed by SMP for product, less credits applied (APS contends the amount is $50,194,280.22 and SMP contends the number is $50,550,993.29);

(b) A difference of $283,313.83 in the calculation of the cash discount SMP granted APS during the post-petition period (APS contends the amount is $451,281.46 and SMP contends the number is $167,967.63); and

(c) A difference of $335,840.81 in credit memos APS alleges SMP issued during the post-petition period but for which APS was not given credit on SMP's post-petition statements.

(PX 40, DX 84; D.I. 110 at 208–09, D.I. 111 at 216–18)

53. With respect to the $356,713.07 difference between the total invoices and applied credits as calculated by APS and SMP, APS concluded that the total was $50,194,280.22. (PX 40) It arrived at this number by reconciling the invoices and credits in APS's computer system to the monthly statements received from SMP. (D.I. 110 at 209–10)

54. In its reconciliation, SMP concluded that the total was $50,550,993.29. (DX 84) It arrived at this number by looking at all of the transactions (debits and credits) on SMP's books and records for the post-petition period. (D.I. 112 at 565–66) SMP prepared computerized printouts to compile a supporting schedule for each number listed. (*Id.* at 566–67)

55. With respect to the difference of $283,313.83 in the calculation of the cash discount, APS arrived at its total of $451,281.46 by listing the amounts paid to SMP during the post-petition period and applying the applicable discount percentage to those numbers. (D.I. 111 at 216–18)

56. SMP arrived at its total of $167,967.63, which it paid to APS, by adding up the remittances submitted by APS to SMP during the post-petition period and applying the appropriate discount to that number. (D.I. 111 at 218, D.I. 112 at 584–85) However, APS did not submit remittances for all of its purchases during the post-petition period. (*Id.*, D.I. 112 at 418–19)

57. The difference of $335,840.81 in credit memos APS alleges SMP issued during the post-petition period but for which APS was not given credit on SMP's post-petition statements arises from four different sources. The first is $125,599.50 APS claims it is owed for credit memos issued in July and September 1998 for returned cores that were never credited to its post-petition account but, instead, were applied to APS's pre-petition account. (PX 90) The second is $99,439.86 in credit memos APS contends SMP issued to third parties even though they bore APS RGN numbers. (PX 91) The third is $71,715.38 in credit memos which APS argues SMP has given no reason for not crediting to APS's post-petition account. Finally, the fourth is $21,931.22 in credit memos for stock lifts where APS agreed to replace one of SMP's creditors' products with SMP product and SMP would then issue credit to APS for the value of the creditor's product removed.

58. **The Relief Sought by the Parties.** APS is seeking damages in the amount of $8,422,092.08 plus prejudgment interest at a rate of 9% against SMP. This amount is comprised of: (1) $714,010.08 on its open account claim; (2) 3,508,082 on its rebate

claim;[2] and (3) $4,200,000 on its warranty claim.[3]

59. SMP has asserted a counterclaim against APS in the amount of $435,340.30 which is comprised of: (1) the $267,372.67 SMP contends it is owed on the open account claim; and (2) the $167,967.63 which SMP paid to APS in cash discounts post-petition, to which SMP now asserts APS was never entitled. (D.I. 94)

## III. CONCLUSIONS OF LAW

■ 1. Bankruptcy courts have long been recognized as courts of equity and, as such, have broad powers to adjudicate debtor-creditor relationships. *United States v. Energy Resources Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990); *In re Papercraft Corp.*, 323 F.3d 228, 233 (3d Cir.2003).

### A. Choice of Law

■ 2. To determine which state's law governs the controversy before it, a Delaware federal court sitting in diversity applies Delaware choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In contract actions, Delaware courts apply the "most significant relationship" test to determine which law applies to the dispute, assuming the laws of the probable jurisdictions in fact conflict with one another. *See Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 394 A.2d 1160 (Del.Supr.1978); *Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del. Supr.1991).

■ 3. In the case at bar, two states are implicated by this test: (1) New York, the location of SMP and its principal place of business; and (2) Texas, the location of APS's headquarters. A choice-of-law analysis is not required, however, where the laws of the relevant jurisdictions do not conflict. *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994); *Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015 (3d Cir.1993). Since both jurisdictions noted above have substantially similar case law regarding the issues at hand and, have adopted without modification the provision of the U.C.C. relevant to the dispute at bar, the laws of the two jurisdictions do not conflict. Therefore, the court has reviewed the U.C.C. and case law from both of the principal jurisdictions.

### B. The Rebate Claim

■ 4. Both New York and Texas courts rely upon settled common law principals to determine whether parties intend to form a binding agreement. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir.1985); *Victoria Air Conditioning, Inc. v. Lebco Constructors, Inc.*, 752 S.W.2d 625 (Tex.App.1988). Furthermore, parties may enter into a binding contract without memorializing their agreement in a fully executed document. *Id.* However, a contract cannot be formed without a mutual intent to be bound, the determination of which is based upon the application of an objective standard. *Four Seasons Hotels, Ltd. v. Vinnik*, 127 A.D.2d 310, 317, 515 N.Y.S.2d 1 (N.Y.App.Div.

**2.** In the alternative, APS contends that it is at least entitled to rebates for its purchases through July 2, 1998 in the amount of $2,033,455.16.

**3.** In the alternative, APS contends that it is entitled to at least $1,253,240 on its warranty claim based on its formula for determining

how much of the $4.2 million returned to SMP was actually defective. In a further alternative calculation, APS claims that it is entitled to $1,685,000 on its warranty claim without regard to the parties' course of dealing.

1987); *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex.App.2000).

▬▬ 5. To determine whether a contract has been formed,

the court looks to the communications between the parties and to the acts and circumstances surrounding these communications. . . . Where a meeting of the minds is contested, as it is here, determination of the existence of a contract is a question of fact. If the fact finder determines that one party reasonably drew the inference of a promise from the other party's conduct, that promise will be given effect in law.

*Angelou,* 33 S.W.3d at 278 (internal citations omitted).

Should the fact finder find that the parties have completed their negotiations of what they regard as essential elements, and performance has begun on the good faith understanding that agreement on the unsettled matters will follow, the court will find and enforce a contract even though the parties have expressly left these other elements for future negotiation and agreement, if some objective method of determination is available, independent of either party's mere wish or desire.

*Four Seasons Hotels,* 127 A.D.2d at 317, 515 N.Y.S.2d 1.

▬▬ 6. In the case at bar, the court concludes that the terms of SMP's April 15, 1998 letter (PX 22) are sufficiently clear and definite to form a binding contract under the objective standard. Although SMP argues that this letter merely states its position with respect to numerous issues such as rebates, warranties, credit, etc., the court finds that the language in the rebate section, as distinguished from other sections, objectively manifests an intent to be bound.

7. The relevant language of the rebate section states:

Standard **will honor** all PIP incentives earned under the terms of our PIP program. All incentives related to sales before the bankruptcy filing **will be credited** to the pre-petition accounts. PIP incentives related to post petition sales **will be issued** as credits to the post petition account and will be available to offset new purchases. PIP incentives **will be calculated** quarterly in arrears.

PX 22 (emphasis added).

8. This language is in contrast to other sections of the letter dealing with other provisions which state, for example, "Standard agrees to the 'Core Return' program . . . [t]he letter agreement is in the hands of our attorney for final review. The final signed agreement will be sent to APS early next week." *Id.* "Standard is willing to start accepting warranty returns as soon as an agreement can be put into place. . . ." *Id.* "Standard is willing to establish a program similar to the Warranty Returns program indicated above." *Id.*

9. While the latter phrases, dealing with other programs, clearly indicate that SMP is willing to enter into negotiations regarding those programs, the language with respect to the rebate program objectively indicates that it is a settled issue and SMP will perform as indicated. This conclusion is further evidenced by APS's acceptance of the terms both orally and by letter. (PX 25; D.I. 110 at 70)

10. Therefore, the court finds that SMP was obligated to pay APS post-petition rebates in accordance with the April 15, 1998 letter. However, the court concludes that SMP's July 2, 1998 letter effectively revoked the contract and, therefore, SMP's obligation to pay ended on that date. Thus, APS is awarded $2,033,455.16 on the rebate claim, the amount due in

rebates, as calculated by SMP through June 1998.

## C. The Warranty Claim

11. As APS did not assume the pre-petition contracts during its bankruptcy, the court concludes that there was no contract between the parties with respect to the issue of warranty returns. APS now seeks to recover the value of actually defective goods returned to SMP under the implied warranty of merchantability established by § 2–314 of the Uniform Commercial Code ("U.C.C.").

12. U.C.C. Section 2–314 "Implied Warranty: Merchantability; Usage of Trade" states in relevant part:

(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

(2) Goods to be merchantable must be at least such as:

\*　　\*　　\*　　\*　　\*　　\*

(c) are fit for the ordinary purposes for which such goods are used; and

\*　　\*　　\*　　\*　　\*　　\*

(3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade.

13. Both New York and Texas have adopted the relevant sections of the U.C.C. without significant modification. *See N.Y. U.C.C.* §§ 2–314, 2–316, 2–607; *Tex. Bus. & Com.* §§ 2.314, 2.316, 2.607.

14. If a seller is a merchant, there is an implied warranty of merchantability. *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 449 (W.D.N.Y.2001). To prevail on a claim of breach of the warranty, a plaintiff "must provide evidence that something was wrong with the product, a

necessary factor in warranty claims." *McCarthy v. Olin Corp.,* 119 F.3d 148 (2d Cir.1997). "The burden is on the buyer to establish any breach with respect to the goods accepted." U.C.C. § 2–607(4).

15. Under U.C.C. § 2–605,

[a] buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the un-stated defect to justify rejection or to establish breach:

(a) where the seller could have cured it if stated seasonably; or

(b) between merchants when the seller has after rejection made a request in writing for a full and final written statement of all defects on which the buyer proposes to rely.

This requirement has been extended to cases where, as here, the purchaser has accepted the goods. *See Uchitel v. F.R. Tripler & Co.,* 107 Misc.2d 310, 434 N.Y.S.2d 77 (N.Y.Sup.App.Term 1980).

16. In the case at bar, APS admittedly accepted the goods and did not state in connection with its rejection of the goods a particular defect. APS seeks to rely on § 2–316(3)(c) of the U.C.C. arguing that through the parties' "course of dealing," the implied warranty was modified to waive this requirement.

17. SMP argues, and the court agrees, that a pre-petition course of dealing is not applicable post-petition, particularly where the debtor does not assume the pre-petition contracts. "A prior course of dealings between the parties is a tool for interpreting existing contracts and may not be used to establish contract formation." *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 761 F.Supp. 1010, 1021 (S.D.N.Y.1991).

18. SMP refused to accept any warranty returns post-petition, therefore, APS

cannot establish a course of dealing with respect to warranty returns during the post-petition period. As such, APS may not recover under this theory.

19. Finally, APS seeks to recover under its warranty claim based upon formulas devised by its attorneys to estimate the amount of product that was actually defective. However, the court concludes that the evidence presented at trial is insufficient, speculative and not credible to support such a claim. APS presented no expert testimony on damages and the evidence of record does not validate APS's theory.

20. For the reasons stated, APS shall not be awarded any damages on its warranty claim.

### D. The Open Account Claim

21. **The dispute over the amount owed.** Claims to recover amounts paid on an open account are contract claims. A plaintiff has the burden of establishing the amount to which it is entitled by a preponderance of the evidence. *See Cole Oil & Tire Co. v. Davis*, 567 So.2d 122, 131–32 (La.Ct.App.1990)("In an action on open account, the plaintiff bears the burden of proving his case by a preponderance of the evidence.").

22. In the case at bar, the parties are arguing over a discrepancy of $356,713.07 out of over $50,000,000 from over 20,000 transactions. The evidence at trial was essentially witnesses from each party stating that based on their respective records and accounting methods, their respective calculations were correct. In rebuttal, each side's witnesses stated that the other side's records and accounting methods were incorrect. The only evidence uniform to both parties' records and accounting methods was that both were prone to errors.

23. As such, the court concludes that based on the evidence, APS has failed to meet its burden to prove the amount of damages to which it is entitled on the amount owed. Similarly, the court concludes that SMP has also failed to meet its burden on its counterclaim proving the amount it is owed. Therefore, neither party is awarded damages on this claim.

24. **The dispute over the cash discount.** The court concludes that SMP agreed to pay APS a 1% cash discount on all purchases made by APS after March 31, 1998 and, subsequently, agreed to increase the cash discount to 1.5% effective May 1, 1998.

25. The parties are arguing over a discrepancy of $283,313.83 in the calculation of the cash discount SMP granted APS during the post-petition period. APS contends the amount was $451,281.46 and SMP contends the amount was $167,967.63. As with the open account claim, these numbers are based on each parties' internal calculations, which are in dispute.

26. For the reasons discussed above with respect to the open account claim, the court concludes that APS has failed to meet its burden of proving it is entitled to any amount above the $167,967.63 conceded by SMP, which it has already paid. Therefore, APS shall not be awarded any damages on its cash discount claim.

27. SMP contends in its counterclaim that the $167,967.63 it paid to APS is unenforceable because it was not supported by any consideration and was not a bargained for exchange. The court concludes that these arguments must fail. APS's consideration for the cash discounts was the continued purchase of products from SMP. To permit a merchant to offer a discount, induce a buyer to purchase merchandise, and then renege on the discount claiming there was no consideration,

would be manifestly unjust and contrary to the good faith requirement of U.C.C. § 2–103(1)(b). As such, the court concludes that SMP is not entitled to the return of the $167,967.63 it paid in cash discounts.

28. **The dispute over the outstanding credit memos.** APS alleges that it is owed $335,840.81 for credit memos SMP issued during the post-petition period but for which APS was not given credit on SMP's post-petition statements. This amount is the sum of four categories of memos.

29. APS first claims it is owed $125,599.50 for credit memos issued in July and September 1998 for returned cores that were never credited to its post-petition account but, instead, applied to APS's pre-petition account. SMP argues that even though the credit memos were issued post-petition, they related to cores that were actually returned pre-petition. The only reason the memos were dated post-petition was because the returns were not processed until after the 546(g) Agreement was in place.

30. APS argues that this makes no sense because if the cores at issue had actually been returned pre-petition, there would have been no reason to delay processing them and applying the credit to APS's pre-petition account. Furthermore, the RGN numbers associated with the cores at issue were all post-petition RGN numbers.

31. The court concludes that based on the evidence of record, APS has met its burden of proof that the cores at issue were returned post-petition and, therefore, APS is entitled to $125,599.50 for these returns.

32. The second category is $99,439.86 in credit memos APS contends SMP issued

to third parties even though they bore APS RGN numbers. APS contends that SMP issued $99,439.86 in credits to third parties even though the memos had APS RGN numbers. No other party would have been requesting credits using APS RGN numbers. Furthermore, the third parties forwarded the memos to APS, acknowledging the mistake by SMP.

33. SMP argues that APS has provided no support for its allegation that it is owed $99,439.86. APS is basing this allegation on the fact that someone says that they found these credits in the system. Furthermore, SMP argues that during the bankruptcy, APS's distribution centers were sold to other companies. The companies that were issued these credits were the companies that bought APS's distribution centers and made returns of the goods they received using APS's old RGN numbers. How they got into APS's system is speculation; even so, APS did not make the returns and, therefore, is not entitled to the credits.

34. Based on the evidence of record, the court concludes that APS has failed to meet its burden of proving that it is entitled to the $99,439.86 in credits SMP issued to third parties.

35. The third category of memos is $71,715.38 in credit memos which APS argues SMP has given no reason for not crediting to APS's post-petition account.[4] SMP argues that these credit memos were never produced to it and, therefore, there is no way to tell what the memos related to or whether or not they should have been applied pre or post-petition.

36. The court agrees with SMP that the burden of proving it was entitled to credits for these memos is squarely on

---

**4.** In its post-trial arguments, APS contends that the amount is now $88,870. Based on the court's ruling, the amount in dispute is irrelevant.

APS. APS did not produce the credit memos. The only evidence at trial was witness testimony stating that they believe they are entitled to it. As such, the court concludes that APS's failure to substantiate the amount is fatal to its claim. Therefore, APS shall not be awarded damages on this claim.

37. Finally, the fourth category is $21,931.22 in credit memos for stock lifts where APS agreed to replace one of SMP's creditors' products with SMP product and SMP would then issue credit to APS for the value of the creditor's product removed. APS argues that on the face of the memos, the stock lifts occurred on or after the petition date.

38. SMP argues that the testimony at trial illustrates that stock lifts take place over a number of days and the lift date on the memos is the date all the paperwork is complete. Therefore, the stock lift itself could have taken place pre-petition and the paperwork was not completed until a couple of days after the petition date.

39. The court agrees with SMP. APS has failed to meet its burden of showing that the stock lifts in question actually occurred post-petition. The evidence at trial shows that these procedures take days to perform and the paperwork is completed at the end. Therefore, in the absence of proof the lifts in question occurred post-petition, APS is not entitled to any damages on this claim.

### E. Prejudgment Interest

40. The parties do not dispute that prejudgment interest is applicable to the case at bar. Furthermore, APS stipulates that it is content to have New York law apply. Under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract ... interest and the rate and date from which it shall be. computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(a) (2003).

41. Where the parties' agreement does not provide a rate of prejudgment interest, New York law provides for the payment of simple interest at a rate of 9% per annum. N.Y. C.P.L.R. § 5004; Spodek v. Park Prop. Dev. Assocs., 96 N.Y.2d 577, 733 N.Y.S.2d 674, 759 N.E.2d 760, 761 (2001). Simple interest is paid on the principal only and not on accumulated interest, therefore, simple interest does not merge with principal and thus does not become part of the base for the computation of future interest. Spodek, 733 N.Y.S.2d 674, 759 N.E.2d at 761.

42. For the reasons stated above, the court has awarded APS damages in the amount of $2,159,054.66 ($2,033,455.16 + $125,599.50). As it is within its discretion under New York law, the court concludes that APS is entitled to prejudgment interest on the $2,033,455.16 of its claim from June 1, 1998 through June 30, 2003, and is entitled to prejudgment interest on the $125,599.50 from July 1, 1999 through June 30, 2003. Therefore, prejudgment interest is calculated as follows:

*1998*

$2,033,455.16 * 9% = $183,010.96 * 7/12 = $106,756.39

Total for 1998 = $106,756.39

*1999*

$2,033,455.16 * 9% = $183,010.96

$125,599.50 * 9% = $11,303.95 * 6/12 = $5,651.97

Total for 1999 = $188,662.93

*2000*

$2,033,455.16 * 9% = $183,010.96

$125,599.50 * 9% = $11,303.95

Total for 2000 = $194,314.91

*2001*

$2,033,455.16 * 9% = $183,010.96

$125,599.50 * 9\% = \$11,303.95$

Total for 2001 = \$194,314.91

*2002*

$\$2,033,455.16 * 9\% = \$183,010.96$

$\$125,599.50 * 9\% = \$11,303.95$

Total for 2002 = \$194,314.91

*2003*

$\$2,033,455.16 * 9\% * 6/12 = \$91,505.48$

$\$125,599.50 * 9\% = \$11,303.95 * 6/12 = \$5,651.97$

Total for 2003 = \$97,157.45

*Total prejudgment interest = \$975,521.50*

43. Therefore, APS's total award equals $\$2,159,054.66 + \$975,521.50 = \$3,134,576.16$

## IV. CONCLUSION

For the reasons stated, APS is awarded \$3,134,576.16. An appropriate order shall issue and judgment shall be entered accordingly.